# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**THEODORE J. DOBSON,**

       **Plaintiff,**              **CIVIL ACTION NO. 2:07-10532**

    **vs.**

                        **DISTRICT JUDGE NANCY G. EDMUNDS**

**COMMISSIONER OF**              **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

            **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:**    Defendant's Motion for Summary Judgment should be DENIED, and the instant case remanded for further proceedings.

*** 

Plaintiff filed an application for Disability Insurance Benefits on March 11, 2003, alleging that he had been disabled and unable to work since July 17, 1995 due to epilepsy and a loss of sense of smell and taste (TR 25, 71). The Social Security Administration denied benefits. (TR 33). A requested *de novo* hearing was held on August 26, 2005 before Administrative Law Judge (ALJ) John W. Belcher, who subsequently found that the claimant was not under a disability at any time prior to December 31, 2000, the date last insured. (TR 31, 182). The ALJ also found that from July 17, 1995 to February 28, 1998 the claimant's epilepsy condition was severe under the Listings. (TR 27). The ALJ determined that from March 1, 1998 through December 31, 2000 the claimant did not have an impairment or combination of impairments that met or medically equaled a listed impairment and had the residual functional capacity to perform work at any exertional level with some non-exertional limitations. (TR 27, 29). On April 27, 2006 the Appeals Council declined to

review the ALJ's decision. (TR 11). The Appeals Council later set aside its action in order to consider additional information but again declined to review the ALJ's decision. (TR 4). Plaintiff commenced the instant action for judicial review. The Defendant filed a Motion For Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

Plaintiff was fifty-five years old at the time of the administrative hearing, with an associate degree in heating and cooling, and previously ran his own business as a heating and cooling contractor from 1973 through 1995. (TR 67, 72, 77, 186). Plaintiff has not engaged in any substantial gainful activity since the July 1995 onset date of his alleged disability. (TR 26, 71). Plaintiff sustained a head injury in 1968 while playing football in high school. (TR 78). The same year, Plaintiff had a car accident and as a result found out that he has epilepsy. (TR 78). Because of the epilepsy, Plaintiff does not have a driver's license and does not drive. (TR 37, 71, 79, 187). When Plaintiff worked in heating and cooling he hired a driver or had friends and family drive him on service calls. (TR 71, 191).

Plaintiff sustained another head injury on October 31, 1990 when he had a seizure and fell from a ladder onto a concrete floor while at work. (TR 71, 109, 110). Plaintiff alleges that the October 1990 accident severed his "vein for sense of smell and taste" and therefore, he could not continue his job because he could no longer detect gas odors and the gas meter he used was not always reliable. (TR 71, 84). Plaintiff claims that he has tried to find employment at businesses located within walking distance of his home, however he alleges that when he discloses on the application that he has epilepsy, the prospective employers do not respond. (TR 79).

Plaintiff is able to care for his dogs and take care of his own personal needs and grooming. (TR 84, 85). He is also able to fix his own meals. (TR 85). However, he does not drive because he never knows when a seizure will occur and he only rides in a car when his mother or sister visit him. (TR 86). When asked about social activities, Plaintiff responded that he is unable to attend these events because he does not drive and "local transportation is not good." (TR 87). Plaintiff complains of short-term memory loss. (TR 71, 130). Plaintiff alleges he has trouble remembering things and must write down information and things that he is supposed to do. (TR 89).

The record contains several letters from Plaintiff's family members and a memo indicating that Plaintiff often does not realize he is having seizures unless there is physical evidence of the seizure, such as Plaintiff having taken something apart during the seizure, destroyed something during a seizure or suffered incontinence during the seizure. (TR 91, 99, 101). Plaintiff's mother wrote that Plaintiff's seizures have caused numerous accidents and incidents at work, including falls through ceilings or off rooftops, and once driving off in a work van during a seizure. (TR 99). Plaintiff's seizures begin with no warning or aura and he may act confused, then begin to carry out activities, including throwing things or jerking his arm up and down. (TR 130).

Plaintiff's inability to recognize every seizure is also supported by the medical record. On May 23, 1996 Plaintiff's treating physician, David Burdette, M.D. noted that although Plaintiff was previously "aware of most of his seizures having occurred, over the past year, he has had decreasing awareness of seizure occurrence. His seizure count is rendered more inexact by the fact that his mother was away for the month of March; therefore, it is likely that he had more than six seizures since his last visit." (TR 168). On February 13, 1997 Dr. Burdette again noted that Plaintiff was having seizures of which he was unaware. "Since his last visit, he reports having had six or seven

seizures; however, his sister states that he had multiple seizures, the occurrence of which he is not aware of (sic)." (TR 165). On March 27, 1997 Plaintiff and his sister reported to Dr. Burdette that Plaintiff had had no seizures since the February 13, 1997 office visit. (TR 164). At a July 31, 1997 office visit, Plaintiff reported only a single seizure since late March 1997 occurring on May 17, 1997. On October 30, 1997 Dr. Burdette noted that since the July 1997 office visit, when his Felbamate dosage was decreased, his seizure frequency increased to daily, brief seizures. (TR 162). However, after Plaintiff's Lamictal dosage was increased, the frequency of the seizures decreased to approximately two seizures in eight weeks prior to the October office visit. (TR 162).

The record reflects a history of some side effects associated with Plaintiff's medications. In a Function Report dated May 17, 2003 Plaintiff indicated that his medications affect his sleep. (TR 84). On December 23, 1997 Deborah Hogan, R.N. noted a call from Plaintiff's sister reporting that Plaintiff had "taken a turn for the worse as far as behavior." (TR 161). Plaintiff's medications were recently changed and he was exhibiting manic behavior and refusing to take his medications. (TR 161). Hogan stated that the sister was "not certain about his seizures since he is alone and they do not know if he has been having them or not." (TR 161).

On February 12, 1998 Dr. Burdette noted that Plaintiff indicated that he has been having approximately two seizures per month. (TR 160). Dr. Burdette stated that Plaintiff "continues to have frequent seizures" and the Nerontin medication did not appear to be aiding significantly in seizure control, therefore he was going to commence a trial of Tegretol to be used in dual therapy with the Lamictal. (TR 160). On June 1, 1998 Dr. Burdette reported that Plaintiff advised that "his seizure frequency has markedly improved, and he is not aware of having had any seizures since his last visit although his mother noted a relatively mild complex partial seizure last week." (TR 159).

On August 4, 1998 Kathryn Humason, R.N. and Dr. Burdette reported that on July 13 Plaintiff had called and left a message reporting "feeling somewhat dizzy and on the verge of seeing double." (TR 158). Humason reportedly called Plaintiff back on August 4, 1998 and Plaintiff reported that he was feeling well, having no problems and that the symptoms had resolved. (TR 158). On December 28, 1998 Dr. Burdette reported that Plaintiff was "experiencing improved seizure control and tolerating his Neurontin taper well." (TR 157). Dr. Burdette also reported that Plaintiff noted reasonable seizure control since his last visit in early June, "but he also notes that he is not aware of the majority of his seizures which occur." (TR 157). Plaintiff had a brief complex partial seizure in November 1998. (TR 157). Over the three weeks preceding the December 28, 1998 office visit, Plaintiff had spent time with relatives and his mother and he stated that his mother and other relatives had observed no seizures. (TR 157).

On June 3, 1999 Dr. Burdette reported that Plaintiff recalled no seizures since his December 28, 1998 evaluation. (TR 156). Dr. Burdette noted that Plaintiff "is tolerating Tegretol and Lamictal well, and he remains seizure free." (TR 156). Dr. Burdette also noted that Plaintiff was experiencing excessive dizziness with a nighttime 800 mg dosage of Tegretol, so the dosage was decreased to 600 mg. (TR 156). On August 9, 1999 Humason reported that she had received a call from Plaintiff indicating that he had been in the emergency room the prior weekend due to an episode of double vision and loss of balance. (TR 155). Plaintiff was advised to get his blood levels checked and they showed a Tegretol level of 8.4 and a Lamictal level of 3.7. (TR 155). Plaintiff was advised that this was not toxic and that the episode many not be due to his medications, therefore he should take one aspirin per day and call if he had any further problems with medications or any breakthrough seizures. (TR 155).

On August 30, 1999 Plaintiff reported to Humason via telephone that he had cut back on his Lamictal by an entire tablet, going from 600 mg per day to 400 mg per day. (TR 154). Plaintiff indicated that he cut back on the Lamictal because of a prior episode of blurred and double vision, nausea, vomiting and loss of balance. (TR 154). Plaintiff also reported that he had suffered a brief seizure in the prior week. (TR 154). On November 29, 1999 Dr. Burdette reported that since the last evaluation in June 1999 Plaintiff had suffered one breakthrough complex partial seizure. (TR 152). Dr. Burdette and Plaintiff discussed the prior episode of diplopia and disequilibrium and increasing his Lamictal to its prior higher dosage. (TR 152). Dr. Burdette also requested an MRI with MRA. (TR 153).

At the June 1, 2000 office visit, Dr. Burdette reported that Plaintiff "believes that he has had a single seizure since his last evaluation in November." (TR 150). Dr. Burdette's conclusion was that Plaintiff "is experiencing mild gait unsteadiness and continued breakthrough seizures." (TR 150). In light of the breakthrough seizures, Dr. Burdette recommended a trial of another anti-epileptic medication, Topamax. (TR 150).

On January 22, 2001 Dr. Burdette noted that Plaintiff "continues to have intermittent complex partial seizures, and [Plaintiff] notes he has had two complex partial seizures within the past month. One of those seizures occurred without evident provocation, and one occurred in the setting of marked psychosocial stress." (TR 148). Dr. Burdette noted that Plaintiff tolerated the initiation of Topamex well. (TR 148).

On August 23, 2001 Dr. Burdette noted that Plaintiff "continues to have approximately monthly complex partial seizures." (TR 147). Plaintiff continued to tolerate the increasing doses of Topamax therapy and noted intermittent diplopia and gait disequilibrium on an increased dosage

of Lamictal. (TR 147). The symptoms resolved when Plaintiff rearranged his dosing schedule. (TR 147). On February 14, 2002 Dr. Burdette noted that to Plaintiff's knowledge, Plaintiff had suffered a single complex partial seizure which occurred in December 2001. (TR 142). Following the seizure, Plaintiff mistakenly took his nighttime dose of medication within an hour of his morning dose and as a result suffered blurred and double vision. (TR 142). The symptoms resolved with napping and did not recur. (TR 142). Dr. Burdette noted that Plaintiff's baseline memory problems remained unchanged and that there was "some indication that his seizures may have improved with increases in his Topamax dosage." (TR 143). Dr. Burdette noted "Were Topamax not to provide adequate seizure control, in light of his base-line memory problems, I would consider tapering the Topamax and initiating a trial of Zonegran." (TR 143).

On August 19, 2002 Plaintiff reported to Dr. Burdette that he had three complex partial seizures since his February 2002 evaluation. (TR 140). Dr. Burdette reported that Plaintiff "continues to have intermittent breakthrough seizures." (TR 140). On both March 21 and September 25, 2003 Dr. Burdette reported that Plaintiff "continues to be aware of only a fraction of his seizures" and that Plaintiff estimates that he has 1-2 complex partial seizures per month. (TR 135, 136). Dr. Burdette concluded that Plaintiff "continues to have breakthrough seizures." (TR 135, 136). On March 21, 2003 Dr. Burdette also noted that Plaintiff was "tolerating his current antiepileptic drug regimen well." (TR 136). However, on September 25, 2003 Plaintiff complained of intermittent diplopia. (TR 135). The Lamictal dosage had been increased to 800 mg per day at the March 21, 2003 evaluation. (TR 137). At the September 25, 2003 evaluation Dr. Burdette decreased the dosage to the original 600 mg per day as a result of Plaintiff's severe diplopia and gait unsteadiness. (TR 135).

Gavin I. Awerbuch, M.D., a neurologist, examined Plaintiff on June 22, 2004 and noted that Plaintiff was taking Tegretol, Topamax, Keppra, Lamictal and Ecotrin and that he "still has seizures on 3 out of 4 days. He may have 3 to 4 seizures per day." (TR 130). Dr. Awerbuch further noted that "[t]hese spells will last four to five minutes and when [Plaintiff] is done he is exhausted and will sleep for at least for (sic) an hour. He apparently never had a generalized tonic-clonic seizure." (TR 130). Dr. Awerbuch suggested an EEG to further identify the characteristics of the seizures so he could make suggestions as to the appropriate anticonvulsant. (TR 131). Dr. Awerbuch stated of Plaintiff, "He is advised no driving or dangerous activities, where he could potentially harm himself or others if he would have a seizure. The patient, in my estimation, is not capable of any type of gainful employment and I have discussed the possibility of applying for disability with him." (TR 131).

From July 20 through 23, 2004, Plaintiff underwent a computer monitored Home EEG recording. (TR 128). The record contains a copy of the EEG study report by Dr. Awerbuch. (TR 129). In a Medical Examination Report dated September 2, 2004 Dr. Awerbuch noted Plaintiff's EEG was abnormal and consistent with "partial onset seizure" and that "[t]here appeared to be subclinical seizure activity in addition to the recorded clinical event." (TR 129). Dr. Awerbuch also noted that Plaintiff had short term memory loss and poor proverb interpretation. (TR 126). Dr. Awerbuch noted that Plaintiff has physical limitations and should only "occasionally" lift six to ten pounds and "never" lift eleven to twenty pounds or more. (TR 127). He further noted that Plaintiff would not be able to use his hands for fine manipulating repetitive action and could not operate foot or leg controls. (TR 127). Dr. Awerbuch noted no limitations on simple grasping, reaching or pushing and pulling. (TR 127). He noted mental limitations with comprehension and memory. (TR

127).  Dr. Awerbuch estimated that in an eight-hour workday, Plaintiff could tolerate only one hour each of standing, walking and sitting.  (TR 127).

At the August 30, 2004 evaluation Dr. Burdette again noted that Plaintiff is often not aware of his seizures.  (TR 133).  Plaintiff and his sister estimated that Plaintiff was having at least three to four seizures per month. (TR 133).  Dr. Burdette concluded that Plaintiff continued to experience frequent breakthrough seizures and recommended tapering off the Topamax and starting Zonegran. (TR 133).  On November 16, 2004 Dr. Burdette provided a letter stating "I have treated Theodore Dobson from January, 1996 through present.  I do not believe that he will be able to engage in any competitive employment on a regular and continuous basis.  I believe that his disability started January 1996 and continues through the present."  (TR 132).

In reports dated February 7 and August 8, 2005 Dr. Burdette again noted that Plaintiff is frequently unaware of his seizures and continues to have breakthrough seizures.  (TR 174).  On August 9, 2005 Dr. Burdette noted that Plaintiff "is aware of having had or has been told about the following seizures: one in March, two in April, three in May, two in June, one in July, and one on the 8th of this month."  (TR 177).  Dr. Burdette noted that Plaintiff's balance difficulties were likely the result of pharmacodynamic interaction between his antiepileptic medications.  (TR 177).

**Medical Expert Testimony**

At the August 26, 2005 administrative hearing medical expert Dr. Judith Willis testified that she had reviewed Plaintiff's medical records but had not personally examined Plaintiff.  (TR 193). Dr. Willis testified that Plaintiff's medical impairment met Listing 11.02 in severity and duration for the period of time from July 1995 to February 1998 and from March 2003 to the present.  (TR

194-96).  Dr. Willis testified that Plaintiff's impairment did not meet the listing between 1998 and 2003

> [b]ecause the frequency of the seizures under that category need (sic) to be once a month or more frequently and during that period, there were visits to the doctor at least every 6 months and the doctor indicated good control of the seizures less frequently than that."  (TR 194).

Dr. Willis further testified that Plaintiff's functional limitations between February 1998 and March 2003 were to "avoid driving, operating dangerous machinery, working at heights, climbing, balancing and that would be it."  (TR 195).  Although a vocational expert attended the hearing, the ALJ did not take testimony from the vocational expert.  (TR 184).

## ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although the Plaintiff's condition met Listing 11.02 from July 17, 1995 to February 28, 1998 and he had not engaged in substantial gainful activity since his alleged onset date, he was not entitled to disability insurance benefits because these events occurred before the date of Plaintiff's application.  (TR 27).  The ALJ found that beginning on March 1, 1998 through December 31, 2000, the date Plaintiff was last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the Listing of Impairments.  (TR 27).  The ALJ based his decision on the testimony of the medical expert who testified that Plaintiff has epilepsy, a severe impairment that met the severity requirements of Listing 11.02, from July 17, 1995 to February 1998 and from March 2003 to the present.  (TR 27).  The ALJ adopted the testimony of the medical expert and found that "[a]t all other times, [Plaintiff] could perform work activities at any exertional level with the usual seizure precautions, including no climbing, balancing, working at heights, or working in hazardous conditions."  (TR 27).  The ALJ held that Plaintiff had the Residual Functional Capacity ("RFC") to perform work at any exertional level

beginning on March 1, 1998 through December 31, 2000, however the epilepsy disorder precluded work that required climbing ladders, ropes and scaffolding or work at heights or involving dangerous machinery. (TR 29). The ALJ found that Plaintiff's statements concerning his symptoms are not entirely credible for the period of time beginning on March 1, 1998 and ending on December 31, 2000. (TR 29). The ALJ also gives "limited weight" to the treating physician's opinion for this same period of time. (TR 29).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this court to try cases *de novo*, or resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter

differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

## DISCUSSION AND ANALYSIS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his RFC, age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *Id*. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).

At step five, the ALJ found Plaintiff functionally capable of performing work at any exertional level and relied exclusively on the pertinent medical-vocational guideline ("Grid"), 20

C.F.R., Pt. 404, Subpt. P, App. 2, described by the ALJ as "Medical-Vocational Rules of Appendix 2, Subpart P, Regulations No. 4," which directed a determination of nondisability. The ALJ did not rely on a vocational expert or other vocational resource in his determination.

The ALJ determined that from March 1, 1998 through December 31, 2000 the Plaintiff had "the residual functional capacity to perform work at any exertional level." However, "[h]is epilepsy disorder precluded work that required climbing ladders, ropes, and scaffolding; or work at heights or involving dangerous machinery." (TR 29). The ALJ found that "there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed prior to the date last insured (20 C.F.R. §§ 404.1560(c) and 404.1566)" based on the following factual findings: (1) Plaintiff's age defined as "approaching advanced age" under 20 C.F.R. § 404.1563; (2) Plaintiff's ability to communicate in English and having at least a high school education, 20 C.F.R. § 404.1564; (3) Plaintiff being unable to perform past relevant work through the date last insured, 20 C.F.R. § 404.1565; (4) Plaintiff's ability to perform work at all exertional levels; and (5) Plaintiff not having "acquired work skills that are transferable to other occupations within the residual functional capacity defined above," 20 C.F.R. § 404.1568. The ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time through December 31, 2000. (TR 31). Having reviewed the entire record, the Court is persuaded that the ALJ's decision for the period of time from March 1, 1998 to March 2003 was not supported by substantial evidence for the following reasons.

**No Substantial Evidence To Support Finding That Plaintiff Did Not Have An Impairment From March 1, 1998 To March 2003**

The ALJ determined that from July 17, 1995 to February 28, 1998 Plaintiff's condition met Listing 11.02 however, beginning on March 1, 1998 through December 31, 2000 Plaintiff did not have an impairment or combination of impairments that met or medically equaled the Listing. (TR 27). The ALJ further adopted the testimony of the medical expert holding that Plaintiff also met the severity requirements for Listing 11.02 from March 2003 to present. (TR 27).

The ALJ states in his opinion that Plaintiff "amended his alleged onset date of disability and requested two periods of disability for the periods of July 17, 1995 to February 28, 1998 and beginning March 1, 2003 through the present." (TR 25). However, it is unclear from the record that Plaintiff amended his alleged date of disability, therefore, the analysis set forth herein is based on Plaintiff's Application for Disability Insurance Benefits in which Plaintiff alleges that he became unable to work on July 17, 1995. (TR 56). Furthermore, the ALJ's decision does not clearly address the period of time from January 1, 2001 to March 2003.

Although the ALJ is not required to discuss every piece of evidence in the record, an ALJ should discuss evidence that, if believed, could lead to a finding of disability. The ALJ is required to consider the applicant's medical situation as a whole. *See Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004). In reviewing the ALJ's decision, the Court must scrutinize the record in its entirety. *See Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992).

The ALJ relies on "[r]ecords from the office of Dr. Awerbuch and Dr. David Burdette" showing that on February 12, 1998, the Plaintiff reported having seizures twice a month. (TR 28). The ALJ noted a "marked improvement" in the number of seizures which Plaintiff suffered after Dr. Burdette switched his medication to Tegretol in 1998. (TR 28). The ALJ states that he gives Dr. Burdette's opinion "limited weight for the period of time from March 1, 1998 to December 31,

-14-

2000" because the "records show that the claimant had good seizure control from March 1, 1998 until March 1, 2003, when seizures became uncontrolled again." (TR 29).

The ALJ "is not required to accept a treating physician's conclusory opinion on the ultimate issue of disability." *Maple v. Commissioner of Social Security*, 14 Fed. Appx. 525, 536 (6th Cir. 2001); *see also* 20 C.F.R. 404.1527(e). However, it is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference. Under 20 C.F.R. § 404.1527(d)(2), the ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The Sixth Circuit has stated that "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters*, 127 F.3d at 529-30.

The ALJ findings on this issue are inconsistent in that the ALJ limits the weight given to Dr. Burdette's opinion for this time period, yet relies on portions of Dr. Burdette's opinion from this same time period in his findings. For example, the ALJ notes that on June 1, 2000 Plaintiff reported having a single seizure since his examination in November 1999. (TR 28). The ALJ does not discuss, and appears to give limited weight to Dr. Burdette's note from the same date that Plaintiff has "continued breakthrough seizures" and Dr. Burdette's recommendation to try another antiepileptic medicine. (TR 150). Similarly, on December 28, 1998, Dr. Burdette states that Plaintiff reports reasonable seizure control, yet Dr. Burdette also states that Plaintiff notes that he "is not aware of the majority of his seizures which occur." (TR 157).

The ALJ addresses the issue of Plaintiff not being aware of his seizures only briefly when the ALJ states that the "records show that is was not until March 21, 2003 when the claimant

reported having one to two seizures a months (sic) but that he was only aware of a fraction of the seizures." (TR 28). As discussed above, the record is rife with evidence that Plaintiff is not aware when a significant portion of his seizures occur, from as early as May 23, 1996 when Dr. Burdette stated that over the past year, Plaintiff "has had decreasing awareness of seizure occurrence." (TR 168). The ALJ fails to address this evidence and fails to explain why the medical expert's testimony is entitled to greater weight than that of the treating physician for the period from March 1, 1998 until March 1, 2003.

Similarly, for the time period beginning March 1, 1998 and ending on December 31, 2000 the ALJ determined that Plaintiff was less than fully credible in his statements about the intensity, duration and limiting effects of his symptoms. (TR 29). An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters,* 127 F.3d at 531. However, credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *Id.* Furthermore, an ALJ's credibility determination must contain "specific reasons" that are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p.

The ALJ states that

Upon considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could have been reasonably expected to produce the alleged symptoms. However, the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible for the period of time beginning on March 1, 1998 and ending on December 31, 2000.

-16-

(TR 29). The ALJ failed to explain this credibility determination and did not identify specific reasons the ALJ found Plaintiff's statements to be less than entirely credible. Therefore, the ALJ provided no reasoned basis for the Court to uphold the credibility determination. The ALJ must adequately explain his rationale in order to permit informed review.

**The ALJ's Finding Of No Exertional Limitations Is Not Supported By Substantial Evidence**

The ALJ states that through the date last insured, Plaintiff's "ability to perform work at all exertional levels was compromised by nonexertional limitations." (TR 31). The ALJ's finding that Plaintiff has no exertional limitations is not supported by substantial evidence in the record. A finding that Plaintiff has no exertional limitations concludes that Plaintiff can perform heavy and extra heavy work. Heavy work is defined as "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. § 404.1567(d). Very heavy work is defined as "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." 20 C.F.R. § 404.1567(e).

The ALJ points out that a state agency review physician determined that Plaintiff "could perform medium exertion [work] with the usual seizure precautions." (TR 30, 119). Similarly, on September 2, 2004 Dr. Awerbuch opined that Plaintiff could occasionally lift or carry up to ten pounds and that Plaintiff could never lift or carry more than ten pounds. (TR 127). This is consistent with the ability to perform sedentary work. 20 C.F.R.§ 404.1567(a). On the contrary, the ALJ decision states that there is "nothing in the record, however, showing that the claimant had any exertional limitations." (TR 30). Plaintiff in his Disability Report dated March 28, 2003 states that in his prior job as a heating and cooling contractor, the heaviest weight he lifted was 100 pounds or more and that he "frequently" lifted fifty pounds or more. (TR 72). However, Plaintiff's last

work date in that position was July 17, 1995 and his first date of disability was more than ten years prior to the ALJ's decision in this matter. At the ALJ hearing on August 26, 2005 the medical expert testified as to functional limitations existing between February 1998 and March 2003 and stated that Plaintiff should "avoid driving, operating dangerous machinery, working at heights, climbing, [and] balancing." (TR 195).

The Commissioner did not meet its burden to show that Plaintiff has the vocational qualifications to perform certain jobs. The Court can find no evidence in the record supporting a finding that Plaintiff can perform work at the heavy and very heavy exertional levels. The evidence in the record addressing exertional limitations does not contemplate an exertional level greater than that of medium exertional work. (TR 30, 119). Furthermore, there is no evidence that Plaintiff's exertional limitations changed at any time during the period from claimed onset of disability, July 17, 1995 through the date of the ALJ's decision, and there is no substantial evidence supporting the ALJ's decision that Plaintiff was without exertional limitations for the time period from March 1, 1998 to December 31, 2000. (TR 29).

**The ALJ Did Not Rely On A Vocational Resource To Determine Whether Plaintiff's Nonexertional Impairment Would Reduce Plaintiff's Occupational Base**

Although the ALJ found that Plaintiff did not have exertional limitations, the ALJ determined that Plaintiff had non-exertional limitations including that Plaintiff cannot climb ladders, ropes or scaffolding, work at heights or work with dangerous machinery. (TR 29). "Given no medically determinable impairment which limits exertion, the first issue is how much the person's occupational base -- the entire exertional span from sedentary to heavy (or very heavy) work -- is reduced by the effects of the nonexertional impairment(s). This may range from very little to very much, depending on the nature and extent of the impairment(s). In many cases, a decisionmaker will

need to consult a vocational expert." SSR No. 85-15. The ALJ did not consult a vocational expert and did not reference a vocational resource to determine what effect Plaintiff's non-exertional limitations would have on his occupational base. SSR 85-15. The ALJ did not meet its burden at step five to prove that there is work available in the economy that Plaintiff can perform.

**Conclusion**

      The ALJ's opinion lacks references to substantial evidence in the record for its conclusions that for the period from March 1, 1998 until March 1, 2003 Plaintiff underwent medical improvement resulting in a finding of not disabled. The ALJ's opinion further lacks reference to substantial evidence in the record for its conclusions that from March 1, 1998 until December 31, 2000 Plaintiff's statements are not entirely credible and the treating physician's opinions are not entitled to greater weight than the medical expert's testimony. Finally, the ALJ's determinations that Plaintiff has no exertional limitations for the period from March 1, 1998 until March 1, 2003 and the determination that Plaintiff's non-exertional limitations would not affect the occupation base available to Plaintiff are not supported by substantial evidence. Therefore the Court recommends remanding the instant action so that the ALJ may specifically cite to medical findings or other record evidence that support his determinations for the period of time from March 1, 1998 until December 31, 2000 and consider Plaintiff's medical situation as a whole, and further make a disability determination for the period from January 1, 2001 to March 2003. The ALJ also remands for further proceedings and development of the record at step number five including the testimony of a vocational expert or reference to other vocational resources allowed under the Regulations. If such an analysis alters the ALJ's determination of Plaintiff's disability status, the ALJ must re-evaluate Plaintiff's disability status and recalculate the period(s) for which he is entitled to benefits.

Accordingly, Defendant's Motion for Summary Judgment should be denied and the instant case remanded for further proceedings consistent with this report and recommendation.

## <u>REVIEW OF REPORT AND RECOMMENDATION</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 03, 2008               s/ Mona K. Majzoub
                                       MONA K. MAJZOUB
                                       UNITED STATES MAGISTRATE JUDGE

## <u>PROOF OF SERVICE</u>

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 03, 2008                    <u>s/ Lisa C. Bartlett                    </u>
                                           Courtroom Deputy